24

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 7 2002

| | |
|---|---|
| JUAN M. GARCIA, | § |
|        Plaintiff, | § |
| | § |
| v. | § |
| | § |
| MATT'S CASH & CARRY BUILDING | § |
| MATERIALS, INC. | § |
|        Defendant | § |

Michael N. Milby
Clerk of Court

CIVIL ACTION NO. B-01-070

JURY TRIAL DEMANDED

## DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MATT'S CASH & CARRY, INC., the Defendant, moves this Court to grant summary judgment in its favor on the Plaintiff's claim of intentional infliction of emotional distress, for the reason that there is no genuine issue of material fact and the Defendant is entitled to judgment as a matter of law.

### Factual Background

1.    The following factual recitation is based on the Plaintiff's own deposition testimony. While the Defendant disputes the truth of certain portions of the Plaintiff's testimony, such testimony nonetheless can, for purposes solely of the instant motion, be regarded as true.

2.    The Plaintiff worked as one of two counter salespersons at the Defendant's San Benito location. He was paid at an hourly rate, and also received a monthly commission based on sales.[1] He reported directly to Joel Rivera, the assistant manager, who in turn reported to Jack Moran, the store manager.[2]

3.    On January 18, 2000, the Plaintiff's wife notified Mr. Rivera by telephone that she and the Plaintiff were taking their daughter to San Antonio to be examined by specialist.[3] On January 21, 2000, the Plaintiff himself called Mr. Rivera from San Antonio and reported that his

---

[1] Deposition of Juan M. Garcia, excerpted portions of which are attached to this Motion as Exhibit "A" and incorporated herein, pp. 21-22.

[2] Exhibit "A," p. 23.

[3] Exhibit "A," pp. 26-27.

daughter was diagnosed as having leukemia and that he would be out for at least four to five weeks.[4] Thereafter, the Plaintiff would call periodically, and several times indicated that he was considering a permanent relocation to San Antonio in order to be closer to the specialized treatment his daughter required.[5]   Mr. Rivera, on at least one occasion, told the Plaintiff to take whatever time he needed to attend to this daughter.[6]

4.    The Plaintiff ultimately remained away from work from January 18 until his return on March 3.[7]   Upon his return, the Plaintiff notified Mr. Rivera that he would need to be out approximately three days during the third week of each month in order to be present during his daughter's treatments.[8] Mr. Rivera, in turn, reportedly informed the Plaintiff that Luis Mancillas, the director over both of Defendant's locations, and Jack Moran, the San Benito store manager, had decided to demote the Plaintiff to the stocker position.[9]

5.    On March 4, the Plaintiff met with Mr. Moran and, according to the Plaintiff, was told that he was assigned to the stocker position at the same hourly rate as before, but without the opportunity to earn commissions.[10] According to the Plaintiff, Mr. Moran further stated that the Plaintiff would not be allowed to take the time off he had requested.[11] The Plaintiff then left the premises and did not return.[12]

6.    The Plaintiff thereafter complained to the United States Department of Labor that the Defendant's failure to reinstate him to his same or to an equivalent position constituted a violation

---

[4] Exhibit "A," pp. 27-28.

[5] Exhibit "A," pp. 29-31, 39.

[6] Exhibit "A," pp. 32.

[7] Exhibit "A," pp.  29, 32.

[8] Exhibit "A," pp. 33, 35.

[9] Exhibit "A," p. 33.

[10] Exhibit "A," pp. 35, 36.

[11] Exhibit "A," p. 36.

[12] Exhibit "A," pp. 37, 40, 60.

of the Family and Medical Leave Act of 1993 (FMLA).[13] An investigation by the Department, in turn, resulted in a determination in the Plaintiff's favor, and the Defendant therefore was ordered to reinstate the Plaintiff to his prior position or to an equivalent position and further to make him whole for any interim loss of pay.[14] Accordingly, the Defendant offered the Plaintiff a position as a commission salesperson in the carpet department and issued him a check for the wages he would have earned in the meantime.[15] The Plaintiff, however, by then had resolved to relocate permanently to San Antonio,[16] and he therefore rejected the offer of reinstatement and similarly rejected the check for back wages.[17]

7.      The Plaintiff then brought the instant suit, seeking to recover under the FMLA, and further seeking to recover in tort on a claim of intentional infliction of emotional distress. The instant motion addresses only the tort claim.

## Arguments and Authorities

8.      Summary judgment, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, is proper,

> if the pleadings, *depositions*, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (emphasis added).

Moreover, "[t]he plain language of Rule 56(c) *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S., 317, 322 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (emphasis added). "If the record taken as a whole could not lead a rational

---

[13] Exhibit "A," p. 44. 29 U.S.C. §§ 2601, et. seq.

[14] Exhibit "A," pp. 44-45.

[15] Exhibit "A," pp. 44-45.

[16] Exhibit "A," pp. 45-47.

[17] Exhibit "A," pp. 45-47.

trier of fact to find for the nonmoving party, there is no genuine issue for trial." Evans v. City of Marlin, Texas, 986 F.2d 104, 107 (5th Cir. 1993), citing Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Moreover, "Rule 56 [is] no longer a disfavored procedure, [but rather] is an integral part of the Federal Rules of Civil Procedure . . . " Waring v. William Morrow & Co., Inc., 821 F. Supp. 1188, 1189 (S.D. Tex. 1993).

9.    On the basis of the foregoing, the critical issue to be determined by the instant motion is whether the evidence, when viewed in a light most favorable to the Plaintiff, nonetheless would show that the Plaintiff cannot, as a matter of law, sustain his burden of proof on at least one element of a claim of intentional infliction of emotional distress. As the following will show, he indeed cannot.

10.    In particular, to prevail on a claim of intentional infliction of emotional distress, the plaintiff must prove that the defendant acted intentionally or recklessly, that the conduct was extreme and outrageous, that the actions of the defendant caused the plaintiff emotional distress, and the resulting emotional distress was severe. GTE Southwest, Inc. v. Bruce, 998 S.W.2d 605, 611 (Tex. 1999). A claim of intentional infliction of emotional distress, moreover, "will not lie if emotional distress is not the intended or primary consequence of the defendant's conduct." Id.

11.    "To be extreme and outrageous, conduct must be so outrageous in character and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Bruce, supra at 611, citing Natividad v. Alexis, Inc., 875 S.W.2d 695, 699 (Tex. 1994), quoting Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993). According to the Texas Supreme Court, "insensitive or even rude behavior does not constitute extreme and outrageous conduct." Bruce, supra at 612. Furthermore, the fact that the conduct might be in violation of a statute does not, in and of itself, cause such conduct to thereby be extreme and outrageous. Southwestern Bell Mobile Sys. v. Franco, 971 S.W.2d 52, 54 n.9 (Tex. 1998). Very importantly, moreover, "[i]n determining whether certain conduct is extreme and outrageous, courts consider the context and relationship between the parties" and, in Texas,

4

have adopted a very strict approach to intentional infliction of emotional distress claims arising in the *workplace*. Id. Bruce, supra at 612-13.

12.     In particular, Texas courts have recognized that, in order to properly manage its business, an employer must at times engage in conduct which necessarily is unpleasant for the employee and which may in fact result in emotional distress. Bruce, supra at 612, citing Johnson v. Merrel Dow Pharms., Inc., 965 F.2d 31, 34 (5th Cir. 1992); Diamond Shamrock Ref. & Mktg. Co. v. Mendez, 809 S.W.2d 514, 522 (Tex. App. - San Antonio 1991), aff'd in part and rev'd in part on other grounds, 844 S.W.2d 198 (Tex. 1992). Accordingly, Texas courts have determined "that a claim for intentional infliction of emotional distress does not lie for ordinary employment disputes," and that the plaintiff instead "must prove the existence of some conduct that brings the dispute outside the scope of an ordinary employment dispute and into the realm of extreme and outrageous conduct." Id. According to the Texas Supreme Court, such extreme and outrageous conduct can be found in a workplace setting "*only in the most unusual of circumstances*." Id. at 613. See also, Ramirez v. Allright Parking El Paso, Inc., 970 F.2d 1372, 1376 (5th Cir. 1992) Johnson, 965 F.2d at 33-34; Ulrich v. Exxon Co., 824 F.Supp. 677, 687 (S.D. Tex., 1993); Porterfield v. Galer Hosp. Corp., 948 S.W.2d 916, 920-21 (Tex. App.- San Antonio 1997, writ denied). Moreover, whether or not conduct rises to the level of extreme and outrageous is initially a question of law for the court to decide. Wornick v. Casas, 856 S.W.2d 732, 734 (Tex. 1989).

## The Conduct Of Which The Plaintiff Complains
## Was Not, As A Matter Of Law, Extreme And Outrageous

13.     The Plaintiff, when asked at his deposition what conduct he regarded as extreme and outrageous, referred to Jack Moran's callousness and insensitivity when he allegedly told him that he was both demoted to the stocker position and would not be allowed time off to attend to his daughter's illness,[18] and further to a remark allegedly made by Mr. Moran a few weeks earlier that the Plaintiff seemingly cared more about his daughter's illness than about keeping his job.[19]

---

[18] Exhibit "A," pp. 65, 66.

[19] Exhibit "A," pp. 65, 66, 68.

14.    In response, the Defendant denies, and in fact denies *emphatically*, that the

Plaintiff was denied time off to be with his daughter. To the contrary , the sole purpose of moving

the Plaintiff to the stocker position was to allow him the complete freedom to miss work as needed

without thereby causing a disruption in sales,  given that he was one of only two counter

salespersons.[20] Moreover, the Defendant denies that there was any meeting at all between the

Plaintiff and Mr. Moran a few weeks before the final March 4, 2000 meeting.[21] Nonetheless,

even taking the Plaintiff's allegations as true for purposes solely of the instant motion, the alleged

conduct of which the Plaintiff complains falls squarely, and as a matter of law, into precisely the

kind of *employment dispute* for which there can be no employer liability on a claim of intentional

infliction of emotional distress. Fifth Circuit cases, in which summary judgment was granted by

the trial court, are very instructive on this point.

15.    In <u>McConathy v. Dr. Pepper/Seven Up Corp.</u>, 131 F.3d 558 (5th Cir. 1997),  for

example, the plaintiff suffered from a chronic jaw disease which necessitated surgery and frequent

absences from work. Her illness - - as well as other complications, such as the need for an

emergency hysterectomy - - caused her to be in a very delicate emotional state, of which her

employer had knowledge.  When the plaintiff asked to be off for an additional surgery, she was

told by her supervisor that she had better get well this time, that he would no longer tolerate her

frequent absences, and that she had abused the of company's benefit programs.  The same

supervisor thereafter pressured her to return to work before she was released, and was unwilling to

allow her time off to have a screw re-inserted in her jaw, a matter which her physician regarded as

an emergency.  The supervisor further instructed the plaintiff's subordinates not to disclose details

of their projects to the plaintiff, and he would refused even to acknowledge the plaintiff when she

was in his presence.  The plaintiff thereafter sued and brought various statutory and common law

claims.  The district court granted summary judgment in favor of the employer.  On appeal, the

---

[20] Affidavit of Luis Mancillas, attached hereto and incorporated herein  as Exhibit "B."

[21] Exhibit "B."

6

Fifth Circuit affirmed, holding as follows with respect to the claim of intentional infliction of emotional distress:

> Even if [the supervisor] was in fact generally cruel, unfair, and threatened to fire her, this does not pass muster as the type of utterly indecent, intolerable, and atrocious behavior necessary to prevail on an intentional infliction of emotional distress claim. See e.g.: Ramirez v. Alright Parking El Paso. Inc., 970 F.2d 1372, 1375-1377 (5ᵗʰ Cir. 1992); Guthrie v. Tifco Indus., 941 F.2d 374, 379 (5ᵗʰ Cir. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992); Wilson v. Monarch Paper Co., 939 F.2d 1138 (5ᵗʰ Cir. 1991). While it is true that inter-office behavior can arise to the level of a tort of intentional infliction of emotional distress, the standard for such a claim is rather rigorous, and we will not lower that standard.

Id. at 564.

16.    In Johnson v. Merrell Dow Pharmaceuticals. Inc., 965 F.2d 31 (5ᵗʰ Cir. 1992), the plaintiff was constantly criticized and threatened with dismissal. On at least one occasion, the criticism turned out to be unfounded. Ultimately, the stress of the workplace caused the plaintiff to suffer psychiatric problems, which in turn forced him to take a disability leave. While he was on leave, his supervisor would call periodically and tell him that his absences were hurting the company. Ultimately, the same supervisor, in a deceptively upbeat tone, phoned and asked the plaintiff to come in and discuss his future with the company. The plaintiff readily did so, but was abruptly fired upon his arrival. The plaintiff thereafter sued, claiming the conduct of his superiors constituted intentional infliction of emotional distress. The district court granted summary judgment in favor of the employer, and the Fifth Circuit affirmed, holding as follows:

> [I]n the employment context, this court applying Texas law has repeatedly stated that a claim for intentional infliction of emotional distress will not lie for mere "employment disputes." The range of behavior covered in "employment disputes" is quite broad and covers most of the conduct complained of by Johnson.

Id. at 33-34.

17.    Finally, in Shaboon v. Duncan, 252 F.3d 722 (5ᵗʰ Cir. 2001), the employee, a medical doctor fulfilling her residency requirement, increasingly showed signs of psychosis. Eventually, she was committed to a mental hospital, after which her duties were greatly curtailed. She was, during her confinement, diagnosed as suffering from severe depression owing, at least in

part, to childhood sexual abuse perpetrated by her father.  Notwithstanding her obviously delicate

emotional state, her supervising physician would at times, at least by her interpretation, "taunt" her

by making reference to the reports of sexual abuse contained in her medical records, and by

making flippant remarks, such as "I guess you don't want to talk about your father, huh." Id. at

726.  The employee ultimately sued and alleged, among other things, a claim of intentional

infliction of emotional distress.[22]  The Fifth Circuit, in turn, held as follows with respect to her

claim:

> [W]e are not convinced that [the supervising physician's] alleged remarks went
> beyond all possible bounds of decency, and were atrocious and utterly intolerable
> in a civilized community.  Shaboon was not exposed to these remarks over a
> protracted period of time or physically threatened, as the plaintiffs were in *GTE
> Southwest*, 998 S.W.2d at 611.  We therefore conclude that even accepting her
> allegations as true, Shaboon cannot prevail on her intentional infliction of
> emotional distress claim.

Id. at 734.  As shown by the foregoing, therefore, remarks of a thoughtless, insensitive or callous

nature, even when made to someone known or believed to be in a fragile emotional state, will not,

as a matter of law, support a claim of intentional infliction of emotional distress, especially when

made in a workplace setting regarding  matters pertaining to work.

      18.    In the present matter, the conduct complained of by the Plaintiff, even if regarded as

having actually occurred, consisted of a demotion and a denial of a request to take periodic leave,

and further  consisted of an alleged insensitive remark that the Plaintiff seemingly cared more about

his daughter's illness than about keeping his job.  Although such statements, had they in fact been

made, likely would have caused the Plaintiff to become upset and perhaps concerned about his

future employment, they nonetheless fall squarely within the realm of "employment disputes"

which, according to the Fifth Circuit Court of Appeals, are not, as a matter of law, actionable as

intentional infliction of emotional distress.

      19.    Moreover, the Plaintiff has acknowledged that, irrespective of what Mr. Moran may

---

[22] In  this particular case, the motion for summary judgment has denied, with respect to the intentional infliction of
emotional distress claim, at the trial level.  The Fifth Circuit, in return, reversed as to that claim, finding that even
taking the allegations as true, the plaintiff could not prevail as a matter of law.

have said or not said, he (the Plaintiff) remained at all times able to see his daughter whenever he chose to and that, at least in his mind, he would simply have put his continued employment at risk by doing so.[23] Furthermore, the Plaintiff had, prior to the March meeting with Mr. Moran, indicated that he very possibly would be quitting in order to move permanently to San Antonio, something he in fact did shortly thereafter.[24] Thus, although the alleged remarks attributed by the Plaintiff to Mr. Moran could be regarded as callous, uncaring or insensitive, they were not, either on their face or in the context of the present matter, statements which did, or which even could, reach the level of extreme and outrageous, especially in a workplace setting. Without question, moreover, the one-time remarks alleged by the Plaintiff, even if they had been made as alleged, are not as thoughtless, insensitive or cruel as those found to be non-actionable as a matter of law by the Fifth Circuit. This Court respectfully should, therefore, render judgment in favor of the Defendant on the Plaintiff's claim of intentional infliction of emotional distress, as the conduct complained of, even if regarded as having actually occurred, did not, as a matter of law, rise to the level of extreme and outrageous.

20.    This motion is supported by the pleadings,[25] and by the summary judgment attached hereto. Insofar as the Court may not grant the partial summary judgment sought, the Court respectively is asked, pursuant to Rule 56(d), to examine the pleadings and evidence, interrogate counsel and, if practicable, ascertain what material facts are actually and in good faith controverted, such that the parties must proceed to trial.

WHEREFORE, the Defendant prays that the Court will set the motion for hearing and thereafter grant the motion and enter judgment that the Plaintiff take nothing on his intentional infliction of emotional distress claim. The Defendant further prays for its costs, and for general relief.

---

[23] Exhibit "A," pp. 38-40.

[24] Exhibit "A," p. 39.

[25] The Defendant refers to the Plaintiff's pleadings for the limited purpose only of illustrating the nature of the Plaintiff's claims, but specifically without admitting to the truth of the matters asserted.

Respectfully submitted,

Raymond A. Cowley
State Bar I.D. No. 04932400

4900 N. 10th Street, Suite A-2
McAllen, Texas 78504
Telephone: (956) 686-1287
Telefacs : (956) 686-6197

ATTORNEY FOR DEFENDANT

OF COUNSEL:

**RODRIGUEZ, COLVIN & CHANEY LLP**

## CERTIFICATE OF SERVICE

I, Raymond A. Cowley, hereby certify that a true and correct copy of the foregoing document has been forwarded by certified mail, return receipt requested, to the following counsel of record, on the __17__ day of __June_____, 2002.

Mr. Carlos Hernandez, Jr.
The Garcia Law Firm, P.C.
201 North First Street
Harlingen, Texas 78550

Raymond A. Cowley

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN M. GARCIA, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. B-01-070 |
| MATT'S CASH & CARRY BUILDING | § | |
| MATERIALS, INC. | § | |
| Defendant | § | JURY TRIAL DEMANDED |

## AFFIDAVIT OF RAYMOND A. COWLEY

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HIDALGO | § |

BEFORE ME the undersigned party on this day personally appeared RAYMOND A.

COWLEY, being known to me on his oath deposed and said as follows:

"My name is Raymond A. Cowley. I am over 18 years of age and have never been

convicted of a felony. I am the attorney of record for the Defendant in the above cause. I therefore

have personal knowledge of the facts stated herein, and those facts are true and correct.

"The documents attached to this affidavit collectively as Exhibit "A" are true and correct

copies of excerpted pages from the deposition of Juan M. Garcia, taken on April 19, 2002, and

also the court reporter's certificate."

Further affiant sayeth naught.

_____
RAYMOND A. COWLEY

SUBSCRIBED AND SWORN TO BEFORE ME on the __17th__ day of __June__,
2002, to certify which witness my hand and official seal.

_____
Notary Public, State Of Texas

MARIA L. SALINAS
MY COMMISSION EXPIRES
November 25, 2003

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3
      JUAN M. GARCIA            )
 4                             )
      VS.                       )  CIVIL ACTION NO. B-01-070
 5                             )
      MATT'S CASH & CARRY       )
 6    BUILDING MATERIALS,       )
      INC.                      )
 7

 8

 9    **********************************************************

10               ORAL VIDEOTAPED DEPOSITION OF

11                     JUAN M. GARCIA

12                     APRIL 19, 2002

13    **********************************************************

14

15

16        ORAL VIDEOTAPED DEPOSITION OF JUAN M. GARCIA,

17    produced as a witness at the instance of the Defendant,

18    and duly sworn, was taken in the above-styled and numbered

19    cause on the 19th day of April, 2002, from 9:12 a.m. to

20    11:00 a.m., before Barbara Barnard, Certified Shorthand

21    Reporter in and for the State of Texas, reported by

22    computerized stenotype machine, at the offices of The

23    Garcia Law Firm, pursuant to the Federal Rules of Civil

24    Procedure and the provisions stated on the record or

25    attached hereto.
```



EXHIBIT
A



21

09:34:11   1   how were you to be paid?

09:34:14   2       A     Hourly wage.

09:34:15   3       Q     Okay.  At what -- were you ever given an

09:34:21   4   opportunity for commission?

09:34:25   5       A     I believe after about eight months, I started

09:34:28   6   getting commission, I believe.

09:34:30   7       Q     And that remained true up until the time your

09:34:36   8   employment terminated?

09:34:37   9       A     Yes, sir.

09:34:37  10       Q     How was your commission calculated?

09:34:48  11       A     I don't remember, sir.

09:34:49  12       Q     At the time your employment terminated, do you

09:34:51  13   recall what your hourly rate was?

09:34:57  14       A     I believe it was minimum wage, I believe.  I'm

09:35:01  15   not sure.

09:35:01  16       Q     Okay.  Do you have any idea or recollection of

09:35:04  17   approximately how much each month you would make in

09:35:08  18   commission?

09:35:09  19       A     Gross or net?

09:35:11  20       Q     Well, let's start with gross.

09:35:16  21            MR. HERNANDEZ:  Objection, form.  If you

09:35:18  22   know.

09:35:28  23            THE WITNESS:  I believe it was no more than

09:35:30  24   400 a month, I believe.

09:35:33  25       Q     (BY MR. COWLEY)  And that would be before

22

| | | |
|---|---|---|
| 09:35:34 | 1 | anything was taken out for taxes and so forth? |
| 09:35:37 | 2 | A    Yes, sir. |
| 09:35:39 | 3 | Q    Okay.  Now, let's talk about maybe the year |
| 09:35:44 | 4 | 1999.  As I understand at the San Benito location, there |
| 09:35:51 | 5 | are two people that work the counter as sales; is that |
| 09:35:55 | 6 | right?  Or that was true when you worked there? |
| 09:35:57 | 7 | A    Yes, sir. |
| 09:35:58 | 8 | Q    And you and a Mr. Perez? |
| 09:36:00 | 9 | A    Yes, sir. |
| 09:36:00 | 10 | Q    I believe that's -- is that Ernest? |
| 09:36:04 | 11 | A    Ernesto Perez. |
| 09:36:05 | 12 | Q    Ernesto Perez, okay.  And the two of you were |
| 09:36:09 | 13 | the only counter sales people in the store? |
| 09:36:11 | 14 | A    No, sir. |
| 09:36:12 | 15 | Q    Who else was there? |
| 09:36:16 | 16 | A    Your stockers had the privilege to go into and |
| 09:36:22 | 17 | be salesmen also. |
| 09:36:23 | 18 | Q    Okay. |
| 09:36:23 | 19 | A    They were trying to be salesmen. |
| 09:36:25 | 20 | Q    All right.  So from time to time, the stockers |
| 09:36:27 | 21 | could also help out at the counter? |
| 09:36:29 | 22 | A    Yes, sir. |
| 09:36:29 | 23 | Q    Okay.  Who do you recall were the stockers back |
| 09:36:32 | 24 | during -- let's say the latter part of 1999? |
| 09:36:36 | 25 | A    Arturo Morales, Javier Salazar.  There was a |

23

| | | |
|---|---|---|
| 09:36:52 | 1 | Ray, but I just don't remember his last name. |
| 09:36:55 | 2 |     Q   Now, if the stockers came to the counter to help |
| 09:36:58 | 3 | out, were they paid a commission or not? |
| 09:37:01 | 4 |     A   No, sir. |
| 09:37:02 | 5 |     Q   You're saying they were not? |
| 09:37:03 | 6 |     A   That's correct. |
| 09:37:12 | 7 |     Q   And the person that -- your first line of |
| 09:37:26 | 8 | supervision, the person immediately above you in the store |
| 09:37:29 | 9 | would have been Mr. Joel Rivera? |
| 09:37:31 | 10 |     A   Yes, sir. |
| 09:37:32 | 11 |     Q   Okay.  And as I understand it, at that time he |
| 09:37:37 | 12 | was the assistant store manager? |
| 09:37:39 | 13 |     A   That's correct. |
| 09:37:41 | 14 |     Q   Okay.  And the person that he worked for was |
| 09:37:45 | 15 | someone by the name of -- who was it? |
| 09:37:48 | 16 |     A   Jack Moran. |
| 09:37:50 | 17 |     Q   Jack Moran, okay.  In your job as counter |
| 09:38:03 | 18 | salesman, would you also sell carpeting? |
| 09:38:08 | 19 |     A   I had the opportunity to; but I don't believe I |
| 09:38:12 | 20 | did too many sales in carpet, no. |
| 09:38:14 | 21 |     Q   Okay.  Who normally would sell the carpeting? |
| 09:38:17 | 22 |     A   Arturo Morales. |
| 09:38:19 | 23 |     Q   One of the stockers? |
| 09:38:21 | 24 |     A   Actually he was a -- he was there at the carpet |
| 09:38:25 | 25 | department at that time. |

26

| | | |
|---|---|---|
| 09:40:55 | 1 | Katie had an illness? |
| 09:40:57 | 2 | A    January 2000. |
| 09:40:59 | 3 | Q    Okay.  I'm going to be asking some questions, |
| 09:41:08 | 4 | Mr. Garcia, because I have to.  You understand we're all |
| 09:41:11 | 5 | very concerned and hopeful for your daughter's recovery. |
| 09:41:14 | 6 | You understand that, I hope? |
| 09:41:16 | 7 | A    Yes, sir. |
| 09:41:17 | 8 | Q    Okay.  According to the information I have, your |
| 09:41:21 | 9 | wife Shannon had called on January the 18th to report that |
| 09:41:27 | 10 | you and your wife and daughter were going to go to San |
| 09:41:31 | 11 | Antonio for treatment.  Does that date sound about right? |
| 09:41:34 | 12 | A    Yes. |
| 09:41:35 | 13 | Q    Okay.  And as far as I know, January 18th when |
| 09:41:39 | 14 | your wife Shannon called was the first indication the |
| 09:41:42 | 15 | company had that -- that your daughter was ill and would |
| 09:41:46 | 16 | need treatment in San Antonio.  Do you agree with that or |
| 09:41:49 | 17 | disagree? |
| 09:41:54 | 18 | A    I'll disagree. |
| 09:41:55 | 19 | Q    Okay.  Had you ever told anybody at the company |
| 09:41:58 | 20 | that your daughter was ill and would need treatment? |
| 09:42:02 | 21 | A    I told -- I called on January 21st, the day I |
| 09:42:06 | 22 | got the diagnosis that my daughter had leukemia. |
| 09:42:12 | 23 | Q    All right. |
| 09:42:13 | 24 | A    I called on the 21st. |
| 09:42:15 | 25 | Q    Okay. |

27

| | | |
|---|---|---|
| 09:42:15 | 1 | MR. HERNANDEZ:  Did you hear his question? |
| 09:42:18 | 2 | Objection. |
| 09:42:18 | 3 | MR. COWLEY:  Okay. |
| 09:42:19 | 4 | MR. HERNANDEZ:  You have to listen to his |
| 09:42:20 | 5 | question, though. |
| 09:42:21 | 6 | Q    (BY MR. COWLEY)  My question was, January |
| 09:42:23 | 7 | the 18th when your wife Shannon called and said that you |
| 09:42:26 | 8 | would need time off to go to San Antonio was the first |
| 09:42:30 | 9 | time the company received any indication that your |
| 09:42:33 | 10 | daughter was ill and needed treatment; is that right? |
| 09:42:36 | 11 | A    Oh, yes, sir. |
| 09:42:37 | 12 | Q    You had never told anyone before January 18th |
| 09:42:40 | 13 | that your daughter was ill or needed treatment? |
| 09:42:43 | 14 | A    That's true, yes, sir. |
| 09:42:45 | 15 | Q    Okay.  Now, your testimony is that you called on |
| 09:42:53 | 16 | January 21st? |
| 09:42:54 | 17 | A    Yes, sir. |
| 09:42:55 | 18 | Q    Where did you call from? |
| 09:42:56 | 19 | A    From the hospital.  Pay phone. |
| 09:43:00 | 20 | Q    Did you call collect? |
| 09:43:02 | 21 | A    1-800 number. |
| 09:43:05 | 22 | Q    You called the company's 1-800 number? |
| 09:43:08 | 23 | A    Yes, sir. |
| 09:43:08 | 24 | Q    All right.  Who did you talk to? |
| 09:43:12 | 25 | A    Joel Rivera. |

28

| 09:43:14 | 1 | Q    Okay.  What did you tell him, by your testimony? |
| 09:43:23 | 2 | What did you say to Mr. -- what is it you're saying that |
| 09:43:26 | 3 | you told Mr. Rivera on that day when you called him, |
| 09:43:30 | 4 | January 21st? |
| 09:43:31 | 5 | A    I told him that my daughter -- they had just |
| 09:43:34 | 6 | told us about my daughter's diagnosis of leukemia. |
| 09:43:37 | 7 | Q    Okay.  Can you recall what else you told |
| 09:43:39 | 8 | Mr. Rivera? |
| 09:43:40 | 9 | A    I told him I would be out for at least four to |
| 09:43:44 | 10 | five weeks. |
| 09:43:44 | 11 | Q    Okay.  Can you recall anything else? |
| 09:43:54 | 12 | A    No. |
| 09:43:55 | 13 | Q    Okay.  Would you like to take a little break? |
| 09:43:58 | 14 | A    No. |
| 09:43:58 | 15 | Q    Would you like some -- let's get a glass of |
| 09:44:01 | 16 | water. |
| 09:44:02 | 17 | MR. HERNANDEZ:  Let's go off the record for |
| 09:44:03 | 18 | a second. |
| 09:44:06 | 19 | (Recess) |
| 09:44:06 | 20 | Q    (BY MR. COWLEY)  Mr. Garcia, are you ready to |
| 09:49:38 | 21 | continue? |
| 09:49:38 | 22 | A    Yes. |
| 09:49:39 | 23 | Q    We were talking about January 21st, and you had |
| 09:49:43 | 24 | called and spoke to Mr. Rivera.  And I was asking you if |
| 09:49:46 | 25 | you would tell us everything that you told him.  Have you |

| | | |
|---|---|---|
| 09:49:51 | 1 | done so, or can you recall anything else that you might |
| 09:49:53 | 2 | have told him? |
| 09:49:54 | 3 | A    That's all I can recall for now. |
| 09:49:56 | 4 | Q    Okay.  What do you recall Mr. Rivera saying to |
| 09:49:59 | 5 | you? |
| 09:50:14 | 6 | A    I can't remember. |
| 09:50:18 | 7 | Q    Okay.  When was the next time you contacted the |
| 09:50:24 | 8 | company after that call? |
| 09:50:25 | 9 | A    I would call on a weekly basis. |
| 09:50:31 | 10 | Q    Okay.  And as I understand, you were out for |
| 09:50:34 | 11 | about six weeks; is that right? |
| 09:50:39 | 12 | A    I believe it was five weeks. |
| 09:50:41 | 13 | Q    Okay.  It would have been from January 18th to |
| 09:50:45 | 14 | about the 3rd of March; am I right? |
| 09:50:49 | 15 | A    That's correct. |
| 09:50:50 | 16 | Q    Okay.  So you would admit, that would have been |
| 09:50:55 | 17 | four or five calls you made during that period? |
| 09:50:57 | 18 | A    I believe so. |
| 09:50:58 | 19 | Q    Okay.  Where would you normally call from? |
| 09:51:06 | 20 | A    Our cell phone. |
| 09:51:08 | 21 | Q    What was that number? |
| 09:51:12 | 22 | A    I don't have the same number anymore.  It's |
| 09:51:15 | 23 | another one. |
| 09:51:15 | 24 | Q    Can you recall what that number was? |
| 09:51:28 | 25 | A    No, sir, I can't. |

30

| 09:51:30 | 1 | Q | Do you still have any of the phone bills that |
| 09:51:32 | 2 | you had from that cell phone? |
| 09:51:34 | 3 | A | I don't know. |
| 09:51:35 | 4 | Q | What company did you have the cell phone service |
| 09:51:40 | 5 | with? |
| 09:51:40 | 6 | A | Voice Stream. |
| 09:51:42 | 7 | Q | Voice Stream? |
| 09:51:44 | 8 | A | Yes, sir. |
| 09:51:44 | 9 | Q | Where was the office where you subscribed to |
| 09:51:47 | 10 | that service? |
| 09:51:48 | 11 | A | Ingram Park Mall. |
| 09:51:51 | 12 | Q | I'm sorry? |
| 09:51:52 | 13 | A | San Antonio. |
| 09:51:53 | 14 | Q | What park mall? |
| 09:51:54 | 15 | A | Ingram Park Mall. |
| 09:51:55 | 16 | MR. HERNANDEZ:  I-N-G-R-A-M. |
| 09:51:58 | 17 | Q | (BY MR. COWLEY)  All right.  And you're saying |
| 09:52:01 | 18 | you no longer have that cell phone number? |
| 09:52:03 | 19 | A | No. |
| 09:52:03 | 20 | Q | Okay.  When did you subscribe for that service? |
| 09:52:11 | 21 | A | I don't recall, sir. |
| 09:52:12 | 22 | Q | All right.  On those occasions that you called |
| 09:52:16 | 23 | weekly, who did you speak to? |
| 09:52:19 | 24 | A | Joel Rivera. |
| 09:52:21 | 25 | Q | On each occasion? |

31

| | | |
|---|---|---|
| 09:52:23 | 1 | MR. HERNANDEZ:  Objection, form. |
| 09:52:27 | 2 | Q     (BY MR. COWLEY)  Did you ever speak to anyone |
| 09:52:30 | 3 | other than Roel -- Joel Rivera when you telephoned? |
| 09:52:34 | 4 | A     I believe one time. |
| 09:52:36 | 5 | Q     Okay.  If you didn't -- on the time that you |
| 09:52:38 | 6 | didn't speak to Mr. Rivera, who did you speak to? |
| 09:52:41 | 7 | A     Jack Moran. |
| 09:52:43 | 8 | Q     Okay.  On those occasions that you called Joel |
| 09:52:48 | 9 | Rivera, my understanding is that you indicated that you |
| 09:52:53 | 10 | might be moving to San Antonio.  Do you recall that? |
| 09:52:59 | 11 | MR. HERNANDEZ:  Objection, form. |
| 09:53:05 | 12 | THE WITNESS:  I -- yes. |
| 09:53:08 | 13 | Q     (BY MR. COWLEY)  Okay.  There were times that |
| 09:53:10 | 14 | you indicated to Mr. Rivera that you simply didn't know |
| 09:53:16 | 15 | when or even if you would be back to work at San Antonio; |
| 09:53:22 | 16 | is that right? |
| 09:53:22 | 17 | A     Yes, sir. |
| 09:53:23 | 18 | Q     Okay.  You would indicate to Mr. Rivera that it |
| 09:53:26 | 19 | all depended on what the tests showed or what the doctors |
| 09:53:30 | 20 | told you? |
| 09:53:30 | 21 | A     That's correct. |
| 09:53:31 | 22 | Q     Okay.  The time that you called and spoke to |
| 09:53:41 | 23 | Mr. Moran, can you recall what you told him? |
| 09:54:07 | 24 | A     The only thing I can recall is I told him that |
| 09:54:10 | 25 | my wife -- my wife.  My daughter, she was doing fine, but |

| | | |
|---|---|---|
| 09:54:18 | 1 | I would still be out.  Because every time we would call, |
| 09:54:21 | 2 | they would ask me when I was coming back, and I had |
| 09:54:24 | 3 | already said I would be out four to five weeks, so -- |
| 09:54:28 | 4 | Q    Okay. |
| 09:54:28 | 5 | A    That's all I can remember. |
| 09:54:30 | 6 | Q    All right.  Can you recall anything that Mr. |
| 09:54:32 | 7 | Moran said to you? |
| 09:54:34 | 8 | A    No, sir. |
| 09:54:37 | 9 | Q    Okay.  And -- okay.  On those times that you |
| 09:54:45 | 10 | spoke to Mr. Rivera, can you recall anything that he said |
| 09:54:47 | 11 | to you? |
| 09:54:53 | 12 | A    I believe he told me to take my time. |
| 09:54:59 | 13 | Q    Can you recall anything else? |
| 09:55:07 | 14 | A    No, sir, I can't. |
| 09:55:09 | 15 | Q    Okay.  Now, my understanding is that on March |
| 09:55:13 | 16 | the 3rd of the year 2000, you showed up for work; is that |
| 09:55:19 | 17 | right? |
| 09:55:20 | 18 | A    Yes, sir. |
| 09:55:20 | 19 | Q    Okay.  Had you notified anyone before March |
| 09:55:22 | 20 | the 3rd that you would be back on that day? |
| 09:55:25 | 21 | A    Yes, sir. |
| 09:55:25 | 22 | Q    Who did you notify? |
| 09:55:26 | 23 | A    Joel Rivera. |
| 09:55:28 | 24 | Q    Okay.  Did you have any conversation with |
| 09:55:33 | 25 | Mr. Rivera that morning as to what your job duties would |

33

| | | |
|---|---|---|
| 09:55:36 | 1 | be now that you were back? |
| 09:55:37 | 2 | A    Yes, sir. |
| 09:55:38 | 3 | Q    Okay.  And by your recollection, what did |
| 09:55:42 | 4 | Mr. Rivera say to you? |
| 09:55:45 | 5 | A    He said Jack Moran and Luis Mancias had demoted |
| 09:55:50 | 6 | me to stocker as of Monday of that week. |
| 09:55:53 | 7 | Q    Okay.  What did you understand your wage would |
| 09:55:58 | 8 | be? |
| 09:55:59 | 9 | A    Did I understand? |
| 09:56:07 | 10 | Q    Yes. |
| 09:56:08 | 11 | A    Minimum -- my current wage -- |
| 09:56:12 | 12 | Q    Okay. |
| 09:56:12 | 13 | A    -- at that time. |
| 09:56:13 | 14 | Q    All right.  Now, did you understand that you |
| 09:56:17 | 15 | would be a stocker only as long as you needed to be taking |
| 09:56:21 | 16 | off work for your daughter? |
| 09:56:22 | 17 | A    I'm sorry.  Rephrase that question, please. |
| 09:56:26 | 18 | Q    Okay.  When you came back on March 3rd, my |
| 09:56:29 | 19 | understanding is you said that you would have to be taking |
| 09:56:33 | 20 | off one week, the third week of every month; am I correct? |
| 09:56:36 | 21 | A    Yes. |
| 09:56:37 | 22 | Q    Okay.  And were you told that as long as you're |
| 09:56:41 | 23 | going to have to be taking off a week a month, that you |
| 09:56:44 | 24 | would be moved to the stocker position? |
| 09:56:46 | 25 | A    I don't recall that, no. |

| | | |
|---|---|---|
| 09:58:31 | 1 | Rivera met with you, I would assume, pretty much right at |
| 09:58:35 | 2 | the start of the day; am I right? |
| 09:58:37 | 3 | A    It was around 9:00 o'clock, I believe, yes. |
| 09:58:40 | 4 | Q    Okay.  And just tell us everything that you |
| 09:58:42 | 5 | recall that he said to you. |
| 09:58:47 | 6 | A    He said -- he told me Jack Moran and Luis |
| 09:58:52 | 7 | Mancias had demoted me to stocker.  That's all I can |
| 09:59:02 | 8 | remember. |
| 09:59:02 | 9 | Q    Okay.  And you had told him that morning that |
| 09:59:05 | 10 | you would have to take off the third week of each month; |
| 09:59:08 | 11 | am I right? |
| 09:59:09 | 12 | A    Three days out of the third week. |
| 09:59:12 | 13 | Q    Okay. |
| 09:59:12 | 14 | A    Yes. |
| 09:59:14 | 15 | Q    Can you recall anything else that Mr. Rivera |
| 09:59:19 | 16 | said to you or that you said to him on March 3rd? |
| 09:59:35 | 17 | A    No, sir. |
| 09:59:36 | 18 | Q    Okay.  And my understanding is you worked the |
| 09:59:40 | 19 | normal workday on March the 3rd? |
| 09:59:42 | 20 | A    Yes, sir. |
| 09:59:43 | 21 | Q    Okay.  Describe for us what you recall happened |
| 09:59:46 | 22 | on March the 4th, just starting with the time that you |
| 09:59:50 | 23 | arrived at work. |
| 09:59:55 | 24 | A    I arrived at 9:00 o'clock to work.  I was -- |
| 10:00:01 | 25 | about a good 30 minutes later, I was called up to the |

| | | |
|---|---|---|
| 10:00:05 | 1 | office by Jack Moran, and he told me a decision had been |
| 10:00:11 | 2 | made to move me to stocker position, and they would not be |
| 10:00:20 | 3 | able to work with my schedule for my days off I needed for |
| 10:00:24 | 4 | my treatment -- for my daughter's treatment. |
| 10:00:25 | 5 | Q    I didn't understand what you said.  Could you |
| 10:00:27 | 6 | repeat the last thing you said? |
| 10:00:34 | 7 | A    On when he had me -- when he took me up to the |
| 10:00:46 | 8 | office, I went to the office.  He told me that him and |
| 10:00:50 | 9 | Luis Mancias had demoted me to stocker, and I would not be |
| 10:00:57 | 10 | given the days off I needed for my daughter's treatment. |
| 10:01:01 | 11 | They could not work with my schedule.  He had a business |
| 10:01:04 | 12 | to run.  That's what he told me. |
| 10:01:13 | 13 | Q    What else, by your testimony, were you told? |
| 10:01:16 | 14 | Anything else? |
| 10:01:22 | 15 | A    He said he understood he was the bad guy here, |
| 10:01:27 | 16 | but this was from Luis Mancias. |
| 10:01:30 | 17 | Q    Anything else you recall? |
| 10:01:39 | 18 | A    He told me -- I told him I did not agree with |
| 10:01:43 | 19 | this.  He then told me to go home because he had nothing |
| 10:01:47 | 20 | else for me. |
| 10:01:49 | 21 | Q    What else are you saying was said? |
| 10:01:53 | 22 | A    What do you mean, sir? |
| 10:01:55 | 23 | Q    What else are you saying was said besides that? |
| 10:01:59 | 24 | Do you recall anything else that, by your testimony, was |
| 10:02:03 | 25 | said? |

37

| | | |
|---|---|---|
| 10:02:03 | 1 | A    I can't recall right now, sir, more. |
| 10:02:09 | 2 | Q    Did you speak to Mr. Rivera after meeting with |
| 10:02:13 | 3 | Mr. Moran? |
| 10:02:14 | 4 | A    No, sir. |
| 10:02:16 | 5 | Q    Did you ever -- did Mr. Rivera after that |
| 10:02:20 | 6 | meeting say to you, "We'll see you tomorrow"? |
| 10:02:23 | 7 | A    No, sir.  He wasn't -- he was off that day. |
| 10:02:27 | 8 | Q    Did you ever go back in and speak to Mr. Rivera? |
| 10:02:31 | 9 | A    No, sir. |
| 10:02:31 | 10 | Q    Did you ever indicate to anyone that you would |
| 10:02:34 | 11 | not be back? |
| 10:02:35 | 12 | A    Not that I can recall, no. |
| 10:02:38 | 13 | Q    Okay.  When you were working at Matt's Cash & |
| 10:02:49 | 14 | Carry, did you have group health care benefits? |
| 10:02:55 | 15 | MR. HERNANDEZ:  Objection, form.  You can |
| 10:02:57 | 16 | answer. |
| 10:03:02 | 17 | THE WITNESS:  I did not have the benefits, |
| 10:03:04 | 18 | no. |
| 10:03:04 | 19 | Q    (BY MR. COWLEY)  Okay.  If you know, did Matt's |
| 10:03:07 | 20 | Cash & Carry even offer group health care benefits to its |
| 10:03:11 | 21 | employees? |
| 10:03:14 | 22 | A    I believe they did. |
| 10:03:16 | 23 | Q    And your testimony is you did not subscribe to |
| 10:03:19 | 24 | it? |
| 10:03:19 | 25 | A    That's correct. |

38

| 10:03:20 | 1 | Q    Okay.  And at that time, your wife was not |
| 10:03:29 | 2 | working; am I right? |
| 10:03:29 | 3 | A    Yes. |
| 10:03:30 | 4 | Q    Okay.  Providing medical care for your -- well, |
| 10:03:38 | 5 | how was your daughter's medical treatment being taken care |
| 10:03:41 | 6 | of if you had no insurance? |
| 10:03:44 | 7 | A    She qualifies for Medicaid. |
| 10:03:47 | 8 | Q    Okay.  So your daughter's continuing medical |
| 10:03:52 | 9 | care did not depend upon you having a job with Matt's Cash |
| 10:03:56 | 10 | & Carry; isn't that true? |
| 10:03:58 | 11 | A    I'm sorry.  Say that again? |
| 10:04:00 | 12 | Q    Your daughter's continuing medical care and |
| 10:04:02 | 13 | treatment did not depend on you having a job with Matt's |
| 10:04:07 | 14 | Cash & Carry; isn't that true? |
| 10:04:08 | 15 | MR. HERNANDEZ:  Objection, form.  You can |
| 10:04:10 | 16 | answer. |
| 10:04:14 | 17 | THE WITNESS:  Yes. |
| 10:04:16 | 18 | Q    (BY MR. COWLEY)  Okay.  Whether you worked at |
| 10:04:19 | 19 | Matt's Cash & Carry or not would not affect your |
| 10:04:22 | 20 | eligibility for Medicaid for your daughter; isn't that |
| 10:04:27 | 21 | true? |
| 10:04:27 | 22 | A    I'm not too sure about that because, see, I -- |
| 10:04:38 | 23 | my wife is the one that took care of all that, so I really |
| 10:04:41 | 24 | can't answer that question. |
| 10:04:44 | 25 | Q    Okay.  Mr. Garcia, you always knew that if you |

| | | |
|---|---|---|
| 10:04:50 | 1 | needed to for your daughter's sake, you could quit, didn't |
| 10:04:54 | 2 | you? |
| 10:04:55 | 3 | MR. HERNANDEZ:  Objection, form. |
| 10:04:57 | 4 | Q    (BY MR. COWLEY)  You may answer, sir. |
| 10:05:00 | 5 | A    Would you repeat the question? |
| 10:05:03 | 6 | Q    You always knew while you were working for |
| 10:05:05 | 7 | Matt's Cash & Carry that if you needed to for your |
| 10:05:09 | 8 | wife's -- for your daughter's benefit, you could quit your |
| 10:05:13 | 9 | job? |
| 10:05:13 | 10 | MR. HERNANDEZ:  Objection, form.  You can |
| 10:05:15 | 11 | answer. |
| 10:05:15 | 12 | THE WITNESS:  Yes. |
| 10:05:15 | 13 | Q    (BY MR. COWLEY)  Okay.  And, in fact, you had |
| 10:05:18 | 14 | indicated on a couple occasions to Mr. Rivera that you |
| 10:05:21 | 15 | might, in fact, quit in order to relocate to San Antonio. |
| 10:05:24 | 16 | Do you recall that? |
| 10:05:25 | 17 | A    Yes. |
| 10:05:25 | 18 | Q    Okay.  You knew that no one could physically |
| 10:05:33 | 19 | restrain you from seeing your daughter and being with your |
| 10:05:36 | 20 | daughter anytime you wanted.  You knew that, didn't you? |
| 10:05:39 | 21 | MR. HERNANDEZ:  Objection, form. |
| 10:05:40 | 22 | Q    (BY MR. COWLEY)  Mr. Moran wasn't telling you |
| 10:05:43 | 23 | you couldn't be off to see your daughter.  Your fear was |
| 10:05:47 | 24 | that if you took the time off, you might lose your job; am |
| 10:05:52 | 25 | I right? |

| | | |
|---|---|---|
| 10:05:52 | 1 | A    I really don't understand your question, sir. |
| 10:05:55 | 2 | Q    Okay.  You understood that you always had the |
| 10:05:58 | 3 | right to take off whenever you wanted to to be with your |
| 10:06:01 | 4 | daughter no matter what the company said, didn't you? |
| 10:06:03 | 5 | MR. HERNANDEZ:  Objection, form.  You can |
| 10:06:05 | 6 | answer. |
| 10:06:05 | 7 | THE WITNESS:  Yes. |
| 10:06:06 | 8 | Q    (BY MR. COWLEY)  Okay.  Your concern was that if |
| 10:06:09 | 9 | you took off, that you might lose your job if you took off |
| 10:06:15 | 10 | to see your -- to be with your daughter.  Is that what |
| 10:06:20 | 11 | your testimony is? |
| 10:06:20 | 12 | A    I'm confused here. |
| 10:06:23 | 13 | Q    Okay.  You understood that -- from what you |
| 10:06:28 | 14 | understood the company was saying or that Mr. Moran was |
| 10:06:32 | 15 | saying was that if you took off to see your daughter or be |
| 10:06:37 | 16 | with your daughter, you might lose your job? |
| 10:06:45 | 17 | A    Yes, sir. |
| 10:06:46 | 18 | Q    Okay.  And did you ever go back to Matt's Cash & |
| 10:07:04 | 19 | Carry and have any conversation with Mr. Rivera regarding |
| 10:07:07 | 20 | your employment or coming back to work? |
| 10:07:11 | 21 | A    No, sir.  I don't believe I did, no. |
| 10:07:13 | 22 | Q    Okay.  At any time while you were still an |
| 10:07:30 | 23 | employee of Matt's Cash & Carry, any time before March |
| 10:07:34 | 24 | the 4th of 2000, had you seen a lawyer with regard to your |
| 10:07:39 | 25 | employment at Matt's Cash & Carry? |

44

| | | |
|---|---|---|
| 10:11:47 | 1 | THE WITNESS:  I'm sorry. |
| 10:11:47 | 2 | MR. HERNANDEZ:  You have to say either yes |
| 10:11:48 | 3 | or no or answer in words. |
| 10:11:50 | 4 | Sorry about that. |
| 10:11:52 | 5 | Q    (BY MR. COWLEY)  You made a claim with the |
| 10:11:54 | 6 | U.S. -- United States Department of Labor regarding your |
| 10:11:58 | 7 | employment with Matt's Cash & Carry; am I right? |
| 10:12:01 | 8 | A    Yes, sir. |
| 10:12:01 | 9 | Q    And you dealt with someone named Elizabeth or |
| 10:12:05 | 10 | Liz Martinez? |
| 10:12:06 | 11 | A    Yes, sir. |
| 10:12:07 | 12 | Q    Okay.  Now, Ms. Martinez communicated to you |
| 10:12:28 | 13 | regarding her investigation with Matt's Cash & Carry; |
| 10:12:34 | 14 | isn't that true? |
| 10:12:34 | 15 | A    Yes, sir. |
| 10:12:35 | 16 | Q    And I've made some records available to your |
| 10:12:39 | 17 | attorney.  One of them is a two-page document entitled |
| 10:12:49 | 18 | FMLA Narrative that I'll mark as Garcia Deposition |
| 10:12:56 | 19 | Exhibit No. 1. |
| 10:13:00 | 20 | MR. HERNANDEZ:  I've seen it. |
| 10:13:01 | 21 | Q    (BY MR. COWLEY)  Okay.  That may be a document, |
| 10:13:04 | 22 | Mr. Garcia, you've never seen before.  You may look at it. |
| 10:13:07 | 23 | Do you recall ever seeing that document before? |
| 10:13:08 | 24 | A    No, sir. |
| 10:13:09 | 25 | Q    According to that document, Ms. Martinez |

45

| | |
|---|---|
| 10:13:13 | 1 |
| 10:13:21 | 2 |
| 10:13:23 | 3 |
| 10:13:26 | 4 |
| 10:13:27 | 5 |
| 10:13:31 | 6 |
| 10:13:35 | 7 |
| 10:13:39 | 8 |
| 10:13:39 | 9 |
| 10:13:41 | 10 |
| 10:13:44 | 11 |
| 10:13:45 | 12 |
| 10:13:48 | 13 |
| 10:13:52 | 14 |
| 10:13:52 | 15 |
| 10:13:53 | 16 |
| 10:13:57 | 17 |
| 10:14:00 | 18 |
| 10:14:06 | 19 |
| 10:14:08 | 20 |
| 10:14:09 | 21 |
| 10:14:12 | 22 |
| 10:14:19 | 23 |
| 10:14:20 | 24 |
| 10:14:20 | 25 |

communicated to you on March 31st of the year 2000 that Matt's Cash & Carry was offering to put you back to work. Do you recall that?

A    Yes, sir.

Q    Okay.  And Ms. Martinez was telling you that the position they had for you was in carpet sales at the same hourly rate with the commission potential.  Do you recall that?

A    Yes.

Q    And you declined the position?

A    Yes.

Q    And her records show that you declined it on or about March 31st.  Does that sound about like what the date was?

A    Yes.

Q    Okay.  And you understood that Matt's Cash & Carry was also offering to pay you for all the time that you missed between March the 4th and the date of your reinstatement.  Do you recall that?

A    Yes.

Q    Do you recall that Matt's Cash & Carry actually had sent you a check to -- for the back wages that you had missed?

A    Yes.

Q    Okay.  I'll show you a document marked as

46

| | | |
|---|---|---|
| 10:14:24 | 1 | Exhibit 2. |
| 10:14:30 | 2 | A    Yeah. |
| 10:14:31 | 3 | Q    Does that look to you to be a true and correct |
| 10:14:33 | 4 | copy of the check that you were sent by Matt's Cash & |
| 10:14:36 | 5 | Carry? |
| 10:14:39 | 6 | A    Yes, sir. |
| 10:14:40 | 7 | Q    Okay.  And eventually, you turned the check back |
| 10:14:46 | 8 | in to Ms. Hernandez; is that correct? |
| 10:14:49 | 9 | A    Ms. Martinez. |
| 10:14:50 | 10 | Q    I'm sorry.  Ms. Martinez? |
| 10:14:52 | 11 | A    Yeah. |
| 10:14:52 | 12 | Q    Okay.  Now, the check marked as Exhibit 2 is |
| 10:15:03 | 13 | dated, as I recall, May the 19th of 2000.  Am I right? |
| 10:15:09 | 14 | A    I'm sorry, sir? |
| 10:15:11 | 15 | Q    The check marked as Exhibit 2 is dated May |
| 10:15:15 | 16 | the 19th of 2000? |
| 10:15:18 | 17 | A    Yes. |
| 10:15:19 | 18 | Q    So you would have received it sometime after |
| 10:15:22 | 19 | that.  Does that sound about right? |
| 10:15:26 | 20 | A    I believe so, yes. |
| 10:15:28 | 21 | Q    Okay.  By that time, you had already rented your |
| 10:15:34 | 22 | home in San Antonio; am I right? |
| 10:15:39 | 23 | A    It's quite possible.  I'm not sure. |
| 10:15:41 | 24 | Q    Okay.  By the time you received that check, you |
| 10:15:46 | 25 | already had an attorney? |

47

| | | |
|---|---|---|
| 10:15:53 | 1 | MR. HERNANDEZ:  Objection, form. |
| 10:15:55 | 2 | THE WITNESS:  I'm not sure if I already had |
| 10:15:57 | 3 | signed a contract with Carlos.  I don't remember. |
| 10:16:00 | 4 | Q    (BY MR. COWLEY)  Okay.  By the time you received |
| 10:16:02 | 5 | the document marked as Exhibit 2, you had already seen |
| 10:16:05 | 6 | Mr. Cordova? |
| 10:16:06 | 7 | A    Yes. |
| 10:16:08 | 8 | Q    Okay.  I take it that sometime before May of |
| 10:16:27 | 9 | 2000, you had decided that your intention was to relocate |
| 10:16:31 | 10 | to San Antonio? |
| 10:16:37 | 11 | MR. HERNANDEZ:  Objection, form.  You can |
| 10:16:40 | 12 | answer. |
| 10:16:41 | 13 | THE WITNESS:  Yes. |
| 10:16:42 | 14 | Q    (BY MR. COWLEY)  Tell us what factors you took |
| 10:16:44 | 15 | into account in making the decision that you would live in |
| 10:16:48 | 16 | San Antonio rather than San Benito. |
| 10:16:54 | 17 | A    Be closer to my daughter's treatments. |
| 10:16:56 | 18 | Q    Okay.  In fact, that was something you had |
| 10:17:06 | 19 | considered a number of months before; am I right? |
| 10:17:09 | 20 | A    Yes. |
| 10:17:10 | 21 | Q    Okay.  During those periods that you were living |
| 10:17:25 | 22 | on Timber Path while your daughter was going through |
| 10:17:28 | 23 | treatment, I'm talking about before March the 4th of 2000, |
| 10:17:32 | 24 | did you ever apply for employment in San Antonio? |
| 10:17:38 | 25 | A    Yes, sir. |

65

| | | |
|---|---|---|
| 10:42:11 | 1 | Q    Is there anything you would attribute that to? |
| 10:42:17 | 2 | A    No. |
| 10:42:18 | 3 | Q    Okay.  Mr. Garcia, your lawsuit talks about -- |
| 10:42:32 | 4 | and I know you're not a lawyer and I won't ask you to be a |
| 10:42:35 | 5 | lawyer, but I'm entitled to know what you know.  I'm |
| 10:42:38 | 6 | entitled to know what you believe to be true. |
| 10:42:40 | 7 | Your lawsuit talks about outrageous |
| 10:42:45 | 8 | behavior engaged in by my client, Matt's Cash & Carry.  I |
| 10:42:50 | 9 | would say to you that outrageous to me would mean conduct |
| 10:42:54 | 10 | that is shocking, that goes beyond the bounds of decency. |
| 10:43:00 | 11 | What is it that you claim was outrageous that my client |
| 10:43:05 | 12 | did? |
| 10:43:07 | 13 | A    The fact that -- the fact that he told me |
| 10:43:12 | 14 | that -- the fact that he told me that I would not have my |
| 10:43:20 | 15 | days off needed for my daughter's treatment.  And the fact |
| 10:43:23 | 16 | that he said that -- that he had a business to run.  I |
| 10:43:29 | 17 | mean, that -- there's no need for that.  Is business more |
| 10:43:34 | 18 | important than my daughter?  I understand you got a |
| 10:43:37 | 19 | business to run, but you don't have to say that to me. |
| 10:43:39 | 20 | Q    You're referring to the conversation on |
| 10:43:42 | 21 | March 4th of 2000 that you say you had with Mr. Moran? |
| 10:43:45 | 22 | A    Yes, sir. |
| 10:43:46 | 23 | Q    Is there anything other than that conversation |
| 10:43:48 | 24 | with Mr. Moran that you would regard as outrageous? |
| 10:43:53 | 25 | A    Not in that conversation, but a couple of weeks |

66

| | | |
|---|---|---|
| 10:43:56 | 1 | before, yes. |
| 10:43:56 | 2 | Q    Okay.  You're saying something happened a couple |
| 10:43:59 | 3 | of weeks before? |
| 10:44:00 | 4 | A    Yes. |
| 10:44:00 | 5 | Q    And what was that? |
| 10:44:01 | 6 | A    He told me -- I gave him the impression that I |
| 10:44:05 | 7 | cared more for my daughter than my job, for my family. |
| 10:44:08 | 8 | Q    Okay.  Now, a couple of weeks before March of |
| 10:44:11 | 9 | 2000, you would have been in San Antonio; am I right? |
| 10:44:14 | 10 | A    Yes. |
| 10:44:14 | 11 | Q    Are you saying you had a conversation with |
| 10:44:18 | 12 | Mr. Moran a couple of weeks before March the 4th of 2000? |
| 10:44:21 | 13 | A    Yes. |
| 10:44:22 | 14 | Q    Okay.  Now, when I asked you earlier what you |
| 10:44:24 | 15 | told Mr. Moran or Mr. Moran told you when you called in |
| 10:44:25 | 16 | from San Antonio, you didn't remember.  Do you recall |
| 10:44:28 | 17 | that? |
| 10:44:28 | 18 | A    Yeah, I remember.  I recall. |
| 10:44:30 | 19 | Q    Are you saying now you do remember something? |
| 10:44:33 | 20 | A    Yes, sir. |
| 10:44:34 | 21 | Q    All right.  What are you saying now you |
| 10:44:36 | 22 | remember? |
| 10:44:36 | 23 | A    I remember now that that's what he told me on |
| 10:44:40 | 24 | that certain time. |
| 10:44:42 | 25 | Q    What are you saying Mr. Moran said on that phone |

68

| | | |
|---|---|---|
| 10:45:58 | 1 | A    I don't recall. |
| 10:45:58 | 2 | Q    Okay.  So you don't remember whether you met |
| 10:46:03 | 3 | with just Mr. Moran or with both Mr. Moran and Mr. Rivera? |
| 10:46:08 | 4 | A    No, I don't remember. |
| 10:46:09 | 5 | Q    Okay. |
| 10:46:10 | 6 | A    I know Mr. Moran was one of them.  I don't |
| 10:46:12 | 7 | remember if Mr. Rivera was in there or not. |
| 10:46:14 | 8 | Q    Okay.  And what is it that you're saying you |
| 10:46:17 | 9 | were told by Mr. Moran? |
| 10:46:18 | 10 | A    He told me that I gave him the impression that I |
| 10:46:21 | 11 | cared more for my family than my job. |
| 10:46:24 | 12 | Q    What else are you saying Mr. Moran said? |
| 10:46:30 | 13 | A    At the time, that's all I can remember. |
| 10:46:31 | 14 | Q    Okay.  So when your lawsuit refers to outrageous |
| 10:46:33 | 15 | behavior to you, the two things that you would regard as |
| 10:46:37 | 16 | outrageous would be the meeting with Mr. Moran on March |
| 10:46:41 | 17 | the 4th, 2000? |
| 10:46:42 | 18 | A    Yes. |
| 10:46:42 | 19 | Q    And the meeting that you say you had with him a |
| 10:46:44 | 20 | couple of weeks before that; am I right? |
| 10:46:48 | 21 | A    Yes, sir. |
| 10:46:48 | 22 | Q    Is there anything else that you say that my |
| 10:46:50 | 23 | client did that you would regard as outrageous? |
| 10:46:53 | 24 | A    I can't recall at this time. |
| 10:46:55 | 25 | Q    Okay.  You've told me everything you can think |

76

```
11:00:05    1           IN THE UNITED STATES DISTRICT COURT
11:00:05                 FOR THE SOUTHERN DISTRICT OF TEXAS
11:00:05    2                    BROWNSVILLE DIVISION
11:00:05
11:00:05    3
11:00:05        JUAN M. GARCIA              )
11:00:05    4                               )
11:00:05        VS.                         )   CIVIL ACTION NO. B-01-070
11:00:05    5                               )
11:00:05        MATT'S CASH & CARRY         )
11:00:05    6   BUILDING MATERIALS,         )
11:00:05        INC.                        )
11:00:05    7

11:00:05    8

11:00:05    9

11:00:05   10
11:00:05               CERTIFICATE OF COURT REPORTER
11:00:05   11

11:00:05   12

11:00:05   13

11:00:05   14
11:00:05            I, BARBARA BARNARD, Certified Shorthand Reporter, do
11:00:05   15   hereby certify the witness, JUAN M. GARCIA, was duly sworn
11:00:05        by me; that the transcript of the witness' deposition is a
11:00:05   16   true record of the testimony given by the witness; that
11:00:05        the deposition transcript was submitted on April 29, 2002
11:00:05   17   to the witness, or to the attorney of record for a party
11:00:05        who was the witness, for examination, for signature, and
11:00:05   18   returned to Hill & Romero by May 29 2002       ; that the
11:00:05        original deposition transcript or a copy thereof, in the
11:00:05   19   event the original was not returned to me, together with
11:00:05        copies of all exhibits, was delivered or mailed to the
11:00:05   20   attorney or party who asked the first question appearing
11:00:05        in the transcript for safekeeping and use at trial; that a
11:00:05   21   copy of the certificate was served on all parties pursuant
11:00:05        to the Federal Rules of Civil Procedure.
11:00:05   22
11:00:05            I further certify that I am neither attorney
11:00:05   23   nor counsel for, related to, nor employed by any of
11:00:05        the parties to the action in which this testimony was
11:00:05   24   taken.  Further, I am not a relative or employee of
11:00:05        any attorney of record in this cause, nor do I have a
11:00:05   25   financial interest in the action.
   00:05
```

77

CERTIFIED on this the _29th_ day of April, 2002.


*Barbara Barnard*
Barbara Barnard
Texas CSR 1998
Expiration Date:  12/31/02
Hill & Romero
Certified Court Reporters
5415 North McColl, Suite 107
McAllen, Texas   78504
(956) 994-8898

SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN M. GARCIA,<br>                Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. B-01-070 |
| MATT'S CASH & CARRY BUILDING<br>MATERIALS, INC.<br>                Defendant | §<br>§<br>§ | JURY TRIAL DEMANDED |

## AFFIDAVIT OF LUIS MANCILLAS

STATE OF TEXAS          §
                              §
COUNTY OF HIDALGO    §

BEFORE ME the undersigned party on this day personally appeared LUIS MANCILLAS, being known to me on his oath deposed and said as follows:

"My name is Luis Mancillas. I am over 18 years of age and have never been convicted of a felony. I am the director over both Matts Cash and Carry, Inc. locations, and was employed by Matts Cash and Carry, Inc. in that capacity at the time Juan Garcia ceased working. I therefore have personal knowledge of the facts stated herein, and those facts are true and correct.

"Juan Garcia began missing work on January 18, 2000. For a number of weeks, Mr. Garcia was very vague regarding when, if at all, he would return to work. At various times, in fact, he indicated that he might relocate permanently to San Antonio. It became evident, moreover, that even if Mr. Garcia might return to work, he would need to miss work frequently, at least for a while.

"I therefore made the decision to transfer Mr. Garcia, upon his eventual return, to the stocker position, at his same hourly rate. He would not, however, while a stocker, receive sales commissions. There are only two counter salespersons at the San Benito location. The purpose of the reassignment, was to allow Mr. Garcia to miss work whenever he needed to, without thereby causing a disruption in sales. The intention was to return him to a commission sales position once he no longer needed to miss work.



EXHIBIT
"B"

"At no time was the decision made to reassign Mr. Garcia permanently, and there certainly was no intention that he be denied time off to be with his family. Moreover, based upon my understand, Mr. Garcia never came to the San Benito store between January 8 and March 3, 2000. The alleged meeting with Jack Moran, therefore, which supposedly took place a few weeks prior to the final March 4 meeting, never happened, and the remark attributed to Mr. Moran similarly, was never made."

Further affiant sayeth naught.

LUIS MANCILLAS

SUBSCRIBED AND SWORN TO BEFORE ME on the ___ day of ___ , 2002, to certify which witness my hand and official seal.

Notary Public, State Of Texas



HILDA L. VILLARREAL
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
05-12-2005