United States District Court
Southern District of Texas
FILED

JUL 1 2 2002

Michael N. Milby
Clerk of Court

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN M. GARCIA, § | | |
|     Plaintiff § | | CIVIL ACTION NO. |
| vs. § | | |
| § | | B-01-070 |
| MATT'S CASH & CARRY BUILDING § | | |
| MATERIALS, INC., and JACK MORAN, § | | |
| individually § | | (JURY REQUESTED) |
|     Defendant § | | |

## PLAINTIFF JUAN M. GARCIA'S RESPONSE TO DEFENDANT MATT'S CASH & CARRY BUILDING MATERIALS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW JUAN GARCIA,** Plaintiff, in the above styled and numbered cause of action, and hereby files pursuant to Rule 56 of the Federal Rules of Civil Procedure, his Response to the Motion for Summary Judgment filed by Defendant, Matt's Cash & Carry Building Materials, Inc.

In response thereto, Plaintiff Juan M. Garcia provides this Court with more than a scintilla of evidence on the element of "extreme and outrageous" conduct in connection with his Intentional Infliction of Emotional Distress claim. In support of his Response, Juan M. Garcia would show unto the Court the following:

I.

## FACTUAL BACKGROUND

Juan M. Garcia previously worked at Matt's for nine years and started with the company in April of 1991. (Plaintiff's depo: p. 17:l.13-14). In fact, he met his wife Shannon at Matt's and they later married. (Plaintiff's depo: p. 20: l. 7-11). He and his wife are salt of the earth people who live day to day - - paycheck to paycheck while raising a family.

For the first eight years of his career at Matt's, Matt's treated Juan and his wife as family. He loyally served Matt's as a carpet salesman, a security guard, and a counter salesman. (Plaintiff's depo: p. 18-20). Despite his loyalty, he did not earn much, but he was generally happy with his life and with the lifestyle he could provide for his loved ones. However, the friendly family atmosphere at Matt's quickly changed in Juan's ninth year of employment. (Plaintiff's depo: p. 33: l. 1-6; p. 35: l. 4-25; p. 36:l. 1-20; p. 40: l. 13-17; p. 61: l. 6-19; p.65: l. 3-25; p. 66: l. 1-7; p. 68: l. 8-21).

It was during this turbulent time in January 2000 that Juan first learned that his infant daughter, who was one year and two months at that time, was diagnosed with every parent's worst nightmare - - his precious daughter Katelyn was diagnosed with leukemia. (Plaintiff's depo: p. 26: l. 8-25). During this critical time in his life, his wife was in her second trimester of pregnancy with their unborn child, Juan M. Garcia, Jr. (Plaintiff's depo: p. 12: l. 18-24).

It is undisputed that Matt's was made aware that Katelyn had leukemia and that Juan needed to go to Santa Rosa's Children's Hospital in San Antonio for extensive treatment. Sometime in late February 2000, Matt's Cash and Carry and its manager, Jack Moran, first showed their true colors. On this fateful day, Jack Moran told Juan, "I have the

impression that you care more for your family than for your job." (Plaintiff's depo: p. 65: l. 3-25; p. 66: l. 1-7; p. 68: l. 8-21). This was foreshadowing the beginning of the end. He also said in a callous manner that he had a business to run. (Plaintiff's depo: p. 65: l. 3-25; p. 66: l. 1-7; p. 68: l. 8-21).

Shortly thereafter on March 3, 2000, Juan being a dedicated and financially strapped employee returned to work and was then informed by Joel Rivera that Jack Moran had demoted him to a stocker. (Plaintiff's depo: p. 32:l. 19-25: p. 33: l. 1-6). This was the gratitude that Matt's had for Juan in light of his nine years of continuous service and during this critical stage in his life.

Adding insult to injury, on March 4, 2000, Jack Moran then came up with its "Indecent Proposal". Basically, if Juan wanted to be with his daughter in San Antonio, he could not have a job in San Benito. Jack Moran said that Matt's would not be able to work with his schedule so that Juan could attend further leukemia treatments with his daughter. Moran again told Juan that he had a business to run. Moran then ordered Juan to go home because he had nothing else for him. (Plaintiff's depo: p. 33: l. 1-6; p. 35: l. 4-25; p. 36:l. 1-20; p. 40: l. 13-17; p. 61: l. 6-19; p.65: l. 3-25; p. 66: l. 1-7; p. 68: l. 8-21).

Juan was fired or constructively discharged on March 4, 2000. It is undisputed that Matt's violated the Family Medical Leave Act of 1993.

Where the Garcia family and Matt's disagree is over whether Matt's is liable for the tort of Intentional Infliction of Emotional Distress. Matt's has essentially taken the position that by presenting Juan with its Indecent Proposal – "your daughter or your job, Juan, you decide" – Matt's was doing him a favor so he could be with his daughter. Such a tactic is utterly intolerable in a civilized society. Plaintiff disagrees that this extraordinary fact

pattern does not rise to the level of extreme and outrageous conduct. While generally ordinary employment disputes do not give rise to intentional infliction of emotional distress claims, this is not an ordinary employment suit.

II.

ARGUMENT & AUTHORITIES

**GENUINE ISSUES OF MATERIAL FACT EXIST WITH REGARD TO JUAN M. GARCIA'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS THEREBY PRECLUDING SUMMARY JUDGMENT**

An employee may recover damages for intentional infliction of emotional distress in an employment context as long as the employee establishes the elements of the cause of action. See *GTE v. Bruce,* 998 S.W.2d 605, 611 (Tex. 1999); *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993).

To recover damages for intentional infliction of emotional distress, a plaintiff must prove that: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Standard Fruit & Vegetable Co. v. Johnson,* 985 S.W.2d 62, 65 (Tex.1998).

Matt's Cash & Carry Building Materials, Inc. contends that it has no liability for intentional infliction of emotional distress in that the alleged conduct perpetrated by its manager, Jack Moran, does not rise to the level necessary to constitute extreme and outrageous conduct.

A.   **The Defendant's Conduct is Extreme and Outrageous.**

Matt's argues that its conduct is really not that "extreme and outrageous". To be extreme and outrageous, conduct must be "so outrageous in character, and so extreme

in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[1] Generally, insensitive or even rude behavior does not constitute extreme and outrageous conduct. *Natividad*, 875 S.W.2d at 699. Similarly, mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct.[2]

In determining whether certain conduct is extreme and outrageous, courts consider the context and the relationship between the parties.[3] "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." Restatement (Second) of Torts §§ 46 cmt. e (1965).

In the employment context, some courts have held that a plaintiff's status as an employee should entitle him to a greater degree of protection from insult and outrage by a supervisor with authority over him than if he were a stranger.[4]

---

[1]*Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994) (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993)); Restatement (Second) of Torts §§ 46 cmt. d (1965).

[2]*See Porterfield v. Galen Hosp. Corp.*, 948 S.W.2d 916, 920 (Tex.App.--San Antonio 1997, writ denied); Restatement (Second) of Torts §§ 46 cmt. d (1965).

[3]*See Atchison, Topeka & Santa Fe Ry. v. Buell*, 480 U.S. 557, 569, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987) ("[S]ome States consider the context and the relationship between the parties significant, placing special emphasis on the workplace."); *Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1143 (5 th Cir.1991) ("The facts of a given claim of outrageous conduct must be analyzed in context....").

[4]*See, e.g., Alcorn v. Anbro Eng'g, Inc.*, 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216, 218 n. 2 (1970); *White v. Monsanto Co.*, 585 So.2d 1205, 1209-10 (La.1991); *see also Bridges v. Winn-Dixie Atlanta, Inc.*, 176 Ga.App. 227, 335 S.E.2d 445, 448 (1985) ("[T]he existence of a special relationship in which one person has control over another, as in the employer-employee relationship, may produce a character of outrageousness that otherwise might not exist."); *Travis v. Alcon Labs., Inc.*, 202 W.Va. 369, 504 S.E.2d 419, 426-27 (1998). This approach is based partly on the rationale that, as opposed to most casual and temporary relationships, the workplace environment provides a captive victim and the opportunity for prolonged abuse. *See Coleman v.*

In contrast, several courts, including Texas courts, have adopted a strict approach to intentional infliction of emotional distress claims arising in the workplace.[5] These courts rely on the fact that, to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees. *See Johnson v. Merrell Dow Pharms., Inc.,* 965 F.2d 31, 34 (5th Cir.1992).

Given these considerations, Texas courts have held that a claim for intentional infliction of emotional distress does not lie for **ordinary** employment disputes. (emphasis added). *Miller,* 911 S.W.2d at 900-01; *see also Johnson,* 965 F.2d at 33. The range of behavior encompassed in "employment disputes" is broad, and includes at a minimum such things as criticism, lack of recognition, and low evaluations, which, although unpleasant and sometimes unfair, are ordinarily expected in the work environment. *See, e.g., Johnson,* 965 F.2d at 33-34; *Ulrich v. Exxon Co., U.S.A.,* 824 F.Supp. 677, 687 (S.D.Tex.1993). Thus, to establish a cause of action for intentional infliction of emotional distress in the workplace, an employee must prove the existence of some conduct that brings the dispute outside the scope of an **ordinary** employment dispute and into the realm of extreme and outrageous conduct.[6] Although not routine, such actionable extreme

---

*Housing Auth. of Americus,* 191 Ga.App. 166, 381 S.E.2d 303, 306 (1989).

[5]*See, e.g., Miller v. Galveston/Houston Diocese,* 911 S.W.2d 897, 900-01 (Tex.App.--Amarillo 1995, no writ); *Amador v. Tan,* 855 S.W.2d 131, 135 (Tex.App.--El Paso 1993, writ denied); *Horton v. Montgomery Ward & Co.,* 827 S.W.2d 361, 369 (Tex.App.--San Antonio 1992, writ denied) ("Incidents in which a Texas court has determined the conduct to be extreme and outrageous in the employer/employee setting are few."); *see also Sterling v. Upjohn Healthcare Servs., Inc.,* 299 Ark. 278, 772 S.W.2d 329, 330 (1989) ( "We have taken a strict view of claims for outrage in employment situations.").

[6]*See Ramirez v. Allright Parking El Paso, Inc.,* 970 F.2d 1372, 1376 (5th Cir.1992) (requiring employee to show conduct "elevating [the employer's] actions above those involved in an 'ordinary employment dispute' ").

conduct situations do in fact exist in the employment setting.[7]

Through his summary judgment evidence, Plaintiff Juan M. Garcia has shown that Matt's and its manager, Jack Moran, engaged in an unusual pattern of grossly abusive, threatening, and degrading conduct. Matt's and its manager Jack Moran engaged in a course of harassing conduct towards Juan M. Garcia, his family and his daughter's fragile medical condition, the totality of which caused severe emotional distress. It is well recognized outside of the employment context that a course of harassing conduct may support liability for intentional infliction of emotional distress. *See, e.g., Duty v. General Fin. Co.*, 154 Tex. 16, 273 S.W.2d 64, 65-66 (1954) (debt collection). In such cases, courts consider the totality of the conduct in determining whether it is extreme and outrageous. *See id.* (analyzing creditor's entire course of conduct, including repetitive threatening phone calls and letters).

Similarly, in the employment context, courts and commentators have almost unanimously recognized that liability may arise when one in a position of authority engages in *repeated* or ongoing harassment of an employee, if the cumulative quality and quantity

---

[7] *See Porterfield*, 948 S.W.2d at 920-21 ("Only in the most unusual of employment cases does the conduct move out of the 'realm of an ordinary employment dispute' and into the classification of extreme and outrageous ...."); *see also Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1143 (5th Cir.1991).

For example, in *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 307 (5th Cir.1989), the court recognized that the supervisor's act of placing checks in the employee's purse to make it appear that she was a thief and to put her in fear of criminal prosecution was extreme and outrageous.

In addition, in *Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1145 (5 th Cir.1991), the court held that the employer's intentional and systematic actions to humiliate the plaintiff, a long-time executive with a college education and 30 years experience, and to force him to quit by requiring him to do menial, janitorial duties was extreme and outrageous. *See also Ramirez*, 970 F.2d at 1376 (discussing *Wilson* ).

of the harassment is extreme and outrageous.[8]  When such *repeated* or ongoing harassment is alleged, the offensive conduct is evaluated as a whole.[9]

In addition to *GTE v. Bruce* case, at least two other Texas courts of appeals have followed this approach.[10] The Texas Supreme Court in *Bruce* stated "[w]e agree with the

---

[8]*See Wornick*, 856 S.W.2d at 736 (recognizing that a number of cases in which courts have found extreme and outrageous conduct "involved repeated or ongoing harassment of an employee"); EDGAR & SALES, TEXAS TORTS AND REMEDIES §§ 45.09 [3], at 45-63 (July 1998) ("[R]epeated or ongoing harassment of the employee is likely to be considered outrageous conduct."); *see also, e.g., Howard Univ. v. Best*, 484 A.2d 958, 986 (D.C.1984) ("*This evidence of a pattern of harassment was sufficient for the jury to find that [defendant] intentionally and recklessly subjected [plaintiff] to outrageous conduct....*"); *Boyle v. Wenk*, 378 Mass. 592, 392 N.E.2d 1053, 1056 (1979) ( "*Repeated harassment ... may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability....*").

[9]*See, e.g., Subbe-Hirt v. Baccigalupi*, 94 F.3d 111, 114-15 (3d Cir.1996) (considering employee's evidence that supervisor repeatedly threatened, cursed and embarrassed employee and engaged in process called "root canal" sufficient to show extreme and outrageous behavior); *Lightning v. Roadway Express, Inc.*, 60 F.3d 1551, 1554-55, 1558 (11 th Cir.1995) (considering the "totality of the circumstances," district court properly entered judgment on evidence that supervisors repeatedly verbally abused and insulted employee, on one occasion tried to hit employee, on another occasion spat on employee, threatened employee, and engaged in concerted effort to provoke and demean employee); *Coleman*, 381 S.E.2d at 306 *(recognizing that although some of the incidents standing alone would not amount to actionable infliction of emotional distress, the repetition, over plaintiff's protests, could be found to have a cumulative effect)*; *Walters v. Rubicon Inc.*, 706 So.2d 503, 507 (La.Ct.App.1997) (evidence that supervisor continuously cursed at, screamed at, and threatened plaintiff, and required him to engage in activities he believed were illegal was sufficient to show extreme and outrageous conduct); *Travis*, 504 S.E.2d at 423 (considering totality of abusive conduct over a four-year period); *Kanzler v. Renner*, 937 P.2d 1337, 1343 (Wyo.1997) (concluding that extreme and outrageous conduct was shown by "repeated incidents over a period of several weeks in which [plaintiff's supervisor] stared at [plaintiff], followed her, and subjected her to sexually- motivated advances and physically intimidating behavior").

[10]*See Qualicare, Inc. v. Runnels*, 863 S.W.2d 220, 223 (Tex.App.--Eastland 1993, no writ) (considering as a whole evidence that supervisor made repeated threats and phone calls, surveilled the employees, and sent a black floral arrangement as a death threat); *American Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 340-42 (Tex.App.--Houston [14 th Dist.] 1991, no writ) (considering as a whole evidence that hospital administrators spread rumors, yelled at, cursed, and insulted plaintiff as part of conspiracy to engage plaintiff in confrontations and use his responses to oppose his appointment)

overwhelming weight of authority in this state and around the country that when *repeated* or ongoing severe harassment is shown, the conduct should be evaluated as a whole in determining whether it is extreme and outrageous". 998 SW2d at 616.

The repeated conduct of Matt's and its manager Jack Moran, taken as a whole, amounts to extreme and outrageous conduct. "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery...." *Wornick,* 856 S.W.2d at 734 (quoting restatement (Second) of Torts §§ 46 cmt. h (1965)). When reasonable minds may differ, however, it is for the jury, subject to the court's control, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability. Restatement (Second) of Torts §§ 46 cmt. h.

Jack Moran's repeated acts of harassment, intimidation, and humiliation and his barrage of inappropriate behavior goes beyond the bounds of tolerable workplace conduct. See *Travis,* 504 S.E.2d at 423; *White,* 585 So.2d at 1210.  Accordingly, Plaintiff Juan M. Garcia has provided this Court with more than a scintilla of evidence regarding the element of "extreme and outrageous" conduct as it relates to the tort of Intentional Infliction of Emotional Distress.

**B.    Even Short Periods of Repeated Severe Conduct are Actionable as Extreme and Outrageous Conduct.**

In *Morgan v. Anthony,* 27 S.W.3d 928 (Tex. 2000), the Texas Supreme Court has recognized that one day of repeated outrageous conduct can give rise to Intentional Infliction of Emotional Distress. It is necessary in this case to recite the facts in some detail in order to describe adequately the basis for this suit. Deborah Morgan recounted that shortly after she left work one afternoon to go home, she began experiencing car trouble.

Her workplace was in Colmesneil, Texas, but she lived in Jasper. She stopped to call her husband to tell him of her problem but could not reach him. She was able to get in touch with her mother and asked her mother to contact either her husband or her father and to send one of them to find her if she was not home in thirty minutes.

As she continued toward her home on U.S. Highway 190, the problems with her automobile worsened. She was no longer able to drive more than five miles per hour, so she began traveling on the shoulder.

As she was making her way, Mack Anthony, whom she had never before seen, pulled in front of her in his pickup. At that point, Morgan's vehicle died. Anthony got out of his truck, approached Morgan's car on the passenger side, and opened the door. He asked if she was having trouble, to which she responded yes, but she told Anthony that her husband, who was a mechanic, or her father was on the way to help her. She thanked Anthony and tried to shut her car door, but he held it open. Anthony then made a statement to the effect that Morgan's husband might not be "taking care of [her] in the car department" and implied that her husband might not be "taking care of her" in other areas of her life. Anthony then said that maybe he could "help [her] in another area." She replied no, that she was a happily married woman and asked Anthony to please let her shut the car door. Anthony responded that he did not live very far away and suggested that Morgan follow him so that he could fix her car "and anything extra that [she] needed."

Morgan continued her efforts to pull her car door closed, but Anthony continued to hold it open. She repeatedly asked him to let her shut her door, but he refused. During most of this exchange, Anthony was leaning into the car with one hand on the dashboard, and he stared between Morgan's legs and at her breasts. When he stepped back, with only

one hand on the car door, Morgan was able to shut and lock it. Morgan made numerous attempts to restart her car as Anthony stood outside the passenger window saying things such as "come on baby, open the door." Morgan's car eventually did restart and she drove off, but she again could not get her car to go faster than five miles per hour.

Anthony got back into his truck and followed Morgan. He passed her, then pulled onto the shoulder in front of her. She was unable to pass because of oncoming traffic that was traveling at about seventy miles per hour. Her vehicle again died. Anthony again got out of his car and began pulling on Morgan's door handle, knocking on the window, and telling her, "see you do need me." She asked him to please leave her alone and told him that he was scaring her. She was able to restart her vehicle, and she again pulled away.

Anthony again followed her, then passed her. He pulled into an abandoned driveway ahead of her, and as she approached, flashed his headlights and motioned with his hands for her to come into the driveway. Morgan did not stop.

Anthony then pursued her, passed her, pulled in front of her on the shoulder, and stopped. Morgan pulled onto the main highway in an effort to pass him. Anthony then would not allow her to pull back onto the shoulder for a period of time. He then pulled ahead of Morgan, and when she returned to the shoulder, he turned onto a dirt road that she was approaching, blocking her access on the shoulder. She stopped her car about five car lengths from Anthony's truck, unable to pass him, and he came to her door on the passenger side. She asked why he would not leave her alone and told him that she was afraid of him. She then pointed to an oncoming truck and told Anthony that it was her husband, although she knew it was not. Anthony ran back to his vehicle and headed in the opposite direction from the oncoming truck.

Morgan again started her car, but about five minutes later, Anthony returned. He again pulled his truck in front of her on the shoulder and stopped. She was able to pull around him, but seven more times, he pulled in front of her. She began staying on the main highway rather than the shoulder in an effort to avoid being stopped by Anthony. He would pull in front of her to force her onto the shoulder to get around him. Finally, Morgan saw a diner and pulled into its parking lot. She went inside and told a waitress what had happened. Her father came to the diner and picked her up.

Morgan reported the incident to law enforcement officials in both Tyler and Jasper Counties. Mack Anthony was ultimately identified. While he admitted that he had stopped to offer assistance to Morgan, he denied any inappropriate conduct. Anthony was not charged with a crime. A Tyler County sheriff's deputy told Morgan that it would just " be her word against [Anthony's]." Morgan sued Anthony about one month after the incident, alleging intentional infliction of emotional distress and seeking damages not to exceed $75,000.

Based on the above recited facts that Morgan set forth, the Texas Supreme Court concluded that there was some evidence that Anthony acted intentionally or recklessly. His actions alone indicated that they were done knowingly and intentionally. And, Anthony persisted in his pursuit of Morgan after she had repeatedly asked that he leave her alone and told him that he was frightening her. The Texas Supreme Court had no difficulty in concluding that there was also evidence of conduct that is " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *City of Midland v. O'Bryant,* 18 S.W.3d 209, 217 (quoting *Mattix-Hill v. Reck,* 923 S.W.2d 596, 597 (Tex.1996) (quoting *Twyman,* 855 S.W.2d at 621)).

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff Juan M. Garcia prays that this Honorable Court deny Defendants' Motion for Partial Summary Judgment and for such other and further relief at law or in equity to which he may show himself justly entitled to receive.

Respectfully submitted,

THE GARCIA LAW FIRM, P.C.
201 North First Street
Harlingen, Texas 78550
Telephone (956) 412-7055
Facsimile (956) 412-7105

By: _____
Carlos E. Hernandez, Jr.
State Bar No. 00787681
Federal Bar No. 17022

Attorney-in-Charge for
Plaintiff, Juan M. Garcia

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing, has been served on all counsel of record, to wit:

### VIA CMRRR 7001 2510 0006 8914 4730

Mr. Raymond A. Cowley
**Rodriguez, Colvin & Chaney, L.L.P.**
4900 N. 10th St., Bldg. A-2
McAllen, TX 78504

by hand delivery or depositing same in the care and custody of the United States Postal Service, by regular mail, unless otherwise specifically specified herein, on July 12, 2002.

_____
Carlos E. Hernandez, Jr.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN M. GARCIA,<br>　　　Plaintiff<br>vs.<br><br>MATT'S CASH & CARRY BUILDING<br>MATERIALS, INC., and JACK MORAN,<br>individually<br>　　　Defendant | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO.<br><br>B-01-070<br><br><br>(JURY REQUESTED) |

## ORDER ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

On _____, 2002, the Court considered the Motion for Partial Summary Judgment filed in this cause by Defendant. The Court, having consider the Motion for Partial Summary Judgment, the admissible summary judgment evidence and arguments and authorities presented, finds that the Motion should be denied. **IT IS THEREFORE,**

**ORDERED, ADJUDGED AND DECREED** that Defendant's Motion for Partial Summary Judgment is hereby **DENIED.**

Any and all relief not specifically granted herein is denied.

**DONE** this ____ day of _____, 2002 at Brownsville, Texas

_____
Magistrate Judge Presiding

xc:　Mr. Raymond A. Cowley
　　　Rodriguez, Colvin & Chaney, LLP
　　　4900 North 10th, Bldg. A-2
　　　McAllen, Texas 78504

　　　Mr. Carlos E. Hernandez, Jr.
　　　The Garcia Law Firm, P.C.
　　　201 North 1st Street
　　　Harlingen, Texas 78550